# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.        Case No. 11-20551

BRANDON RAY JOHNSON, et al.,

    Defendants.
                                                   /

## ORDER DENYING DEFENDANT BRANDON
## RAY JOHNSON'S MOTION TO SUPPRESS

Defendant Brandon Ray Johnson and eight other co-defendants are charged with conspiring to distribute the controlled substance Oxycontin. Pending before the court is Defendant Johnson's motion to suppress evidence, in which Defendants' Tico Mason, Kacee Porter, Vernon Mason IV ("Vernon Mason" or "Mason IV"), Delanoy Mason, and Elizabeth Barker have joined or concurred. Defendants argue that the evidence obtained from a search of a Super 8 hotel room in Portsmouth, Ohio, should be suppressed because the search, done pursuant to a warrant, was conducted in violation of their Fourth Amendment rights. The Government responded in opposition. On April 5, 2012, the court held an evidentiary hearing on the motion. For the reasons stated below, the court will deny Defendant Johnson's motion.

## I. BACKGROUND[1]

On June 20, 2011, Detective Steve Timberlake of the Portsmouth Police Department Narcotics Unit received two telephone tips that set in motion a sequence of

---

[1] The Government's statement of facts in its response brief contains numerous averments that were not provided in the search warrant affidavit. Many of these relate to the entry into the motel room, an event that preceded the warrant's issuance. Because the court's review of the sufficiency of a search warrant is limited to the four corners of the affidavit supporting the warrant, *United States v. Frazier,* 423 F.3d 526, 531 (6th Cir. 2005), the court's recitation of the facts relevant to the warrant will be based only on the affidavit submitted in support of it.

events ultimately resulting in the discovery of a stash of Oxycontin pills in a Super 8 hotel room and the arrests of Defendants Johnson, Mason IV, and Barker. In the first call, an unknown and anonymous tipster called the Portsmouth Police Department drug tip hotline and informed Detective Timberlake that a white female named Beth and a Detroit resident known only as "B" were staying in a hotel in Rosemount, Ohio. (Search Warrant Affidavit 00126, Dkt. # 106-4.) The tipster further said that "B" was "an associate of Vernon Mason's." (*Id.*) In the second referenced telephone call, apparently received sometime after the first call, a known but confidential informant[2] informed Detective Timberlake that he was at that moment with an Oxycontin dealer named Vernon Mason at the Kroger grocery store in Portsmouth and would soon be wiring money via Western Union to an individual in Detroit, Michigan, at Mason IV's behest. (*Id.* at 00125)

Following the call from the confidential informant, Detective Timberlake arrived at the Kroger store and observed Defendant Mason IV and the informant at the customer service desk. (*Id.*) After Mason IV and the informant left the store, Detective Timberlake verified with the service desk employee that Defendant Mason IV and the confidential informant had wired $2000 to an individual in Detroit. (*Id.*) Detective Timberlake then contacted Detroit police officer Lori Dillon, to inform her that Defendant Mason IV and the informant had wired money to Detroit. (*Id.*) At the time, the Detroit Police Department was investigating a suspected narcotics trafficking operation believed to be transporting drugs from Michigan to the Portsmouth area. (*Id.*) Officer Dillon advised Detective Timberlake that she had received information from an informant indicating that Defendants Mason IV and Johnson were trafficking Oxycontin pills to the Portsmouth area. (*Id.*) Sometime after the conversation with Officer Dillon,

---

[2]The identity of this informant was later revealed, and he was produced by the Government to testify at the hearing.

Detectives Timberlake and Josh Justice, also a detective with the Portsmouth Police Department Narcotics Unit, began surveilling the informant's residence. (*Id.* at 00126.) The detectives made telephonic contact with the confidential informant, and learned that he would soon be driving Defendant Mason IV to another residence in Portsmouth to deliver sixty-two Oxycontin pills. (*Id.*) The detectives followed Defendant Mason IV and the informant when they left the informant's residence. (*Id.*) At approximately 4:52 p.m., Detectives Timberlake, Justice, and Portsmouth police officer Lynn Brewer stopped the vehicle the informant was driving and removed Defendant Mason IV. (*Id.*) After advising Defendant Mason IV of his *Miranda* rights, the officers searched him and discovered that he was in possession of a large sum of money (Defendant Mason IV estimated the amount to be approximately $4000), as well as two keys (plastic key cards, not physical metallic keys) to room 320 at the Super 8 hotel in Portsmouth. Referring to the keys, Defendant Mason IV indicated that his cousin, identified only as "B," was at the Super 8 hotel. (*Id.*) During the stop, the confidential informant also turned over three Oxycontin pills and indicated that Defendant Mason IV had given him the pills. (*Id.*) The informant also stated that Defendant Mason IV had placed the other pills in his mouth just as the traffic stop was about to happen.[3] (*Id.*)

Following the traffic stop, Detective Justice and Detectives Matt Spencer and John Koch of the Scioto County Sheriff's Department went directly to the Super 8 hotel

---

[3] In argument, Defendant Johnson's counsel noted that Defendant Mason IV was not hospitalized that day and argued that it was incredible to suggest that Mason IV could have ingested sixty-two pills with no obvious physical repercussions. The witness, however, had made clear in his testimony that Defendant Mason IV placed in his mouth the plastic bag containing the pills, not just the pills. It is without doubt unusual, but it is nevertheless not unheard of to be able to swallow such things. See, e.g., *United States v. Gregory*, 315 F.3d 637, 639 (6th Cir. 2003) (observing that to conduct prison drug smuggling scheme, an inmate swallowed three balloons containing cocaine, heroin, and methamphetamines); *United States v. Barnes*, No. 90-5165, 1991 WL 1336, at *1 (6th Cir. Jan. 10, 1991) (noting that the smuggling technique of "swallowing" "entails packing the [drugs] into balloons or condoms and swallowing them so as to avoid detection by customs agents").

to secure the room. (*Id.*) After knocking several times on the door to room 320 and announcing themselves as police officers, the three detectives heard an individual "running through the room." (Gov't's Resp. to Def. Johnson's Mot. Suppress 4, Dkt. # 106.) The detectives attempted to gain entry using one of the key cards seized from Defendant Mason IV but were unsuccessful because a secondary lock was engaged. (*Id.*) The detectives forced entry into the room, conducted a limited security sweep, and located three individuals in the room: (1) Defendant Johnson; (2) Defendant Barker; and (3) Defendant Barker's minor child. (Search Warrant Affidavit 00126.) The detectives informed the three individuals that they were there to secure the room pending the issuance of a search warrant. Detective Koch left the Super 8 hotel to prepare a search warrant affidavit, and Detectives Justice and Spencer remained at the hotel. The room was not searched except to determine that there was no other person present.

Approximately two hours after the detectives secured the hotel room, a magistrate issued a search warrant. Upon serving the warrant on Defendants Johnson and Barker, the detectives discovered 62 30mg Oxycontin pills inside a toilet paper roll. (Gov't's Resp. to Def. Johnson's Mot. Suppress 3.) Officers searching the exterior of the hotel also discovered 320 additional Oxycontin pills on the ground directly below room 320's window. (*Id.*)

## II. DISCUSSION

Defendant Johnson asserts two arguments for the exclusion of the evidence obtained in the search of room 320. First, he contends that the initial warrantless entry to secure the hotel room and prevent the destruction of evidence violated the Fourth Amendment. Second, he argues that the affidavit supporting the search warrant was insufficient. Before considering the merits of Defendant Johnson's motion, the court first addresses the Government's contention that Defendants Kacee Porter, Tico Mason, and Delanoy Mason lack standing to challenge the search of the hotel room.

4

## A. Standing of Defendants Porter, Tico Mason, and Delanoy Mason

The Government argues that Defendants Porter, Tico Mason, and Delanoy Mason lack standing to concur in Defendant Johnson's motion to suppress because they have failed to demonstrate that they have a legitimate expectation of privacy in the hotel room searched. "'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'" *Alderman v. United States*, 394 U.S. 165, 174 (1969). Accordingly, "a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights. The defendant's Fourth Amendment rights are violated only when the challenged conduct invaded his legitimate expectation of privacy rather than that of a third party." *United States v. Payner*, 447 U.S. 727, 731 (1980). Thus, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Id.* at 132 n.1.

In the instant case, Defendants Porter, Tico Mason, and Delanoy Mason have not proffered any evidence—nor have they even argued—in support of a finding that the search of the hotel room invaded *their* legitimate expectations of privacy. Indeed, its not clear whether these Defendants ever visited Portsmouth, let alone the Super 8 hotel. Accordingly, they have not established any legitimate expectation of privacy in the hotel room. They each lack standing to challenge the warrantless entry and subsequent search.

## B. Validity of Search Warrant

The Government argues that exigent circumstances—specifically, concern that individuals inside the hotel room would destroy evidence of criminality—justified the fast and warrantless entry into the room. To launch an inquiry designed to definitively determine the constitutionality of such an entry is to invite a journey into discrete factual findings and a weighing and balancing of societal and law enforcement interests. In some cases that journey will be mandatory, or at least advisable. Here, it is neither. The court may avoid determining whether the initial entry into the hotel room was justified by exigent circumstances and simply assume that it was not, because suppression of the evidence discovered during the execution of the search warrant is not required where the warrant was valid and supported by probable cause.[4]

Pursuant to the independent source rule, evidence is admissible "if the government shows that it was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir. 2005) (citing *United States v. Leake*, 95 F.3d 409, 416 (6th Cir. 1996)). Defendant Johnson argues that because the affidavit in support of the search warrant incorporated information learned by the detectives during the warrantless entry, the evidence

---

[4]The court, however, observes that the Government has proffered considerable evidence in support of its contention that the warrantless entry was supported by probable cause and exigent circumstances. Based upon the affidavit and hearing testimony, the initial entry into the hotel room was preceded by quite a number of investigative observations and facts. Detectives Justice and Koch testified that they had confirmed the Michigan registration of a black automobile in the otherwise nearly-empty hotel parking lot was to a person named "Elizabeth" and noted that this fit with the anonymous caller's information that a "Beth" would be driving from Detroit in a black car with someone named "B, " an "associate" of Defendant Mason IV. According to the affidavit, Defendant Mason IV referred to his "cousin" as "B" and told Detective Timberlake that he was at the hotel. The detectives further knew that the Detroit officer's informant stated that an individual known as "Brandon Johnson" was with Defendant Mason IV in Portsmouth for the purpose of selling Oxycontin. "Brandon," it may be noted, begins with "B." Finally, upon their approach to the hotel room, the detectives announced their presence with a loud knock and a clear call that "the police" wanted the occupants to open the door. From within, only the sound of rustling feet, quick movements, and running around could be heard. There was no verbal answer, and the door was not opened. In their testimony, Detectives Koch and Justices stated their concern that evidence might be destroyed if they waited to enter the hotel room.

6

obtained during the execution of the search warrant is not independent of the initial entry. Specifically, Defendant Johnson contends that but for the initial entry, the detectives would not have learned the identities of the individuals in the hotel room, information which was included in the affidavit. (Def. Johnson's Reply to Gov't's Resp. 4.) The mere fact that the affidavit contains information obtained during the original warrantless entry, however, does not itself demonstrate that the independent source rule does not apply. Instead, "for evidence to be inadmissible due to the government's failure to collect it via an independent source, the tainted information presented to the judge must affect the judge's decision in a *substantive*, meaningful way." *Jenkins*, 396 F.3d at 758 (citing *United States v. Herrold*, 962 F.2d 1131, 1141 (3d Cir. 1992)). "If the application for a warrant 'contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, providing that the officers were not prompted to obtain the warrant by what they observed during the initial entry.'" *Id.* (quoting *Herrold*, 962 F.2d at 1141-42). Because the search warrant, after excising all information obtained during the warrantless entry, is supported by probable cause, and because the decision to obtain the warrant was made prior to the initial entry, the evidence obtained during the search is admissible under the independent source rule.

     Defendant Johnson contends that Detective Koch's decision to participate in the initial warrantless entry into the hotel room prior to meeting Detective Timberlake to draft the affidavit proves that Detective Koch's "decision to obtain and then to execute the search warrant was informed by the information the officers' [sic] illegally learned in their initial, unauthorized entry." (Def. Johnson's Reply to Gov't's Resp. 4.) Detective Koch, however, testified at the hearing that the decision to seek a search warrant was made prior to the initial entry. Detective Koch said that Detective Timberlake, following the traffic stop of the informant and Defendant Mason IV, contacted him and informed

7

him that Pat Apel, a Scioto County prosecutor, directed the detectives to immediately secure the hotel room and apply for a search warrant. Detective Justice, the only detective present at both the traffic stop and initial entry into the hotel room, corroborated Detective Koch's statements, specifically testifying that during the traffic stop Detective Timberlake contacted Apel and relayed the information and evidence that had been discovered up until that point. According to Detective Justice, Apel advised Detective Timberlake to immediately send officers to secure the room corresponding to the hotel keys seized from Defendant Mason IV and to seek a search warrant. Although it may be a better practice to avoid having the officer who will ultimately draft the search warrant affidavit participate in the initial, warrantless entry in order to avoid the appearance that the entry affected the decision to obtain the search warrant, the uncontroverted testimony of Detectives Koch and Justice demonstrates that the decision to obtain a search warrant was made before the warrantless entry. Therefore, "'the officers were not prompted to obtain the warrant by what they observed during the initial entry.'" *Jenkins*, 396 F.3d at 758 (quoting *Herrold*, 962 F.2d at 1141).

As to the sufficiency of the affidavit in support of the search warrant, the court finds that the untainted information in the affidavit provides a substantial basis for a magistrate to conclude that probable cause existed to search the hotel room. In accordance with the Sixth Circuit's directive in *Jenkins*, the court must determine, and then ignore, the information contained in the affidavit that was obtained from the initial entry. *Id.* at 760. Here, the following statement is the only information included in the affidavit that was discovered during the initial entry: "Present in the room was a black male identifying himself as a Brandon Johnson, a while female identifying herself as Elizabeth Barker, and a small, juvenile, [sic] child." (Search Warrant Affidavit 00126.) Accordingly, the court will evaluate the affidavit without giving consideration to this single statement.

8

Under the Fourth Amendment, "no warrant shall issue but upon probable cause, supported by oath or affirmation." U.S. Const. amend. IV. "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate 'a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *Frazier*, 423 F.3d at 531 (quoting *Jenkins,* 396 F.3d at 760). A probable cause determination is made in light of "the totality of the circumstances," *Illinois v. Gates*, 462 U.S. 213, 230 (1983), and the "standard is a 'practical non-technical conception' that deals with the 'factual and practical considerations of everyday life,'" *Frazier*, 423 F.3d at 531 (quoting *Gates*, 462 U.S. at 231). "When reviewing a magistrate's determination that probable cause existed for the issuance of a search warrant, [a court] must determine, under a totality of the circumstances, whether 'the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *United States v. Miggins*, 302 F.3d 384, 394 (6th Cir. 2002) (quoting *United States v. King*, 227 F.3d 732, 739 (6th Cir.2000)). Where a search warrant affidavit relies on hearsay information from a confidential informant, "a court must consider the veracity, reliability, and the basis of knowledge for that informant as part of the totality of the circumstances for evaluating the impact of that information." *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003). "[I]n the absence of any indicia of the informant's reliability, courts insist that the affidavit contain substantial independent police corroboration." *Frazier*, 423 F.3d at 532. A court's review of the sufficiency of the evidence supporting probable cause is "limited to the four corners of the affidavit." *Id.* at 531.

The information in the affidavit provides a sufficient basis to reasonably believe that Defendant Mason IV and Defendant Johnson were in Portsmouth for the purpose of drug trafficking. On the day of the search, a confidential informant contacted Detective Timberlake and said that he was with Vernon Mason, an Oxycontin dealer from Detroit

9

at the Portsmouth Kroger. (Search Warrant Affidavit 00125.) The informant further stated that Defendant Mason IV requested that he wire $2000 to an individual in Detroit. (*Id.*) The affidavit indicates that Detective Timberlake corroborated the informant's information by driving to the Kroger store, observing the informant and Defendant Mason IV at the Western Union counter, and confirming with a Kroger employee that Defendant Mason IV and the informant had wired money to an individual in Detroit. (*Id.*) Detective Timberlake received additional information corroborating the informant's claim that Defendant Mason IV was an Oxycontin dealer from Detroit police officer Lori Dillon, who stated that she received information from an unidentified informant that Defendant Mason IV and Defendant Johnson were supposed to be transporting 30 mg and 80 mg Oxycontin pills to Portsmouth.[5] (*Id.*) In addition to the later-verified telephoned information from the known confidential informant, Detective Timberlake received an anonymous tip on the Portsmouth drug hotline indicating that a white female named Beth and an individual from Detroit known only as "B" were staying at a hotel in Rosemount and "B" was an associate of Defendant Mason IV.[6] (*Id.* at 00126.)

The subsequent traffic stop provided additional evidence of drug trafficking. During a telephone conversation with the confidential informant, occurring sometime after Detective Timberlake observed Defendant Mason IV at Kroger, Detective

---

[5] Although the affidavit fails to provide any indicia of Officer Dillon's informant's reliability, the information was independently corroborated, at least in part, by the following information contained in the affidavit: (1) statements of the confidential informant, corroborated by Detective Timberlake, that Defendant Mason IV was an Oxycontin dealer from Detroit and was presently in Portsmouth selling drugs, (Search Warrant Affidavit 00125); (2) Detective Timberlake's observations at the Kroger store, (*Id.*); (3) the discovery of Oxycontin pills, attributed to Defendant Mason IV, during the traffic stop; and (4) Defendant Mason IV's statement during the traffic stop that the hotel keys he possessed belonged to his cousin, an individual known only to Defendant Mason as "B," (*Id.*).

[6] During the hearing, it was revealed that the Super 8 hotel searched by the detectives is commonly referred to as being in the city of Rosemount despite having a mailing address of Portsmouth. It also seems to enjoy a reputation of being the hotel of choice for visiting drug dealers.

10

Timberlake learned that the informant would be driving Defendant Mason IV to a residence in Portsmouth to deliver sixty-two Oxycontin pills.  (*Id.*)  After executing a traffic stop on the informant's car, the informant turned over three pills to Detective Timberlake, said that the pills were given to him by Defendant Mason IV, and further indicated that Mason IV placed the remaining Oxycontin pills he was suspected of possessing in his mouth.  (*Id.*)  Detective Timberlake also searched Defendant Mason IV and discovered a large sum of money, two hotel keys to room 320 at the Super 8 hotel, and a business card for the hotel.  (*Id.*)  Defendant Mason IV informed Detective Timberlake that his cousin "B" was currently at the hotel.  (*Id.*)  In spite of the fact that neither the anonymous tipster nor Defendant Mason IV explicitly stated that "B" was a moniker of Defendant Johnson, Defendant Mason IV's information combined with Officer Dillon's statement that Defendant Johnson was in Portsmouth with Defendant Mason IV for the purpose of selling Oxycontin leads to a reasonable inference that "B" refers to Defendant Johnson's first initial and is a street name.

Defendant Johnson contends that even if the affidavit supports a probable cause determination as to whether Defendants Mason IV and Johnson were trafficking drugs, it does "not contain particular specificity or nexus to [r]oom 320 . . . [because] the only information Mason provided about room 320 was that the motel room keys were for his cousin, 'B.'"  (Def. Johnson's Reply to Gov't's Resp. 2.)  The Sixth Circuit, however, has held that evidence of specific wrongdoing occurring at the residence—or in this case, the hotel room—of a suspected drug dealer is unnecessary to establish the requisite nexus between the place to be searched and the evidence to be obtained, because "it is reasonable to suppose that a drug dealer stores narcotics and equipment used in the distribution of narcotics at his home, even though no drug trafficking was observed to occur there."  *United States v. Goward*, 188 F. App'x 355, 259 (6th Cir. 2006); *see also Miggins*, 302 F.3d at 393-94 (6th Cir. 2002) (citing favorably cases from the First,

Second, Fourth, Seventh, Eighth, Ninth, and D.C. Circuits for the proposition that a magistrate may reasonably conclude that evidence of drug trafficking is likely to be found where drug dealers reside). Here, there is sufficient information in the affidavit to conclude that Defendants Mason IV and Johnson—suspected drug traffickers—were residing, for the time being, at room 320 of the Super 8 hotel. First, the "factual and practical considerations of everyday life," *Gates*, 462 U.S. at 231, dictate that Defendants Mason IV and Johnson, whose residences were nearly 300 miles away, were likely staying at a hotel while in Portsmouth. Such an inference is supported by Defendant Mason IV's possession of hotel keys, the anonymous tipster's statement that "B," an associate of Defendant Mason IV, was staying in a local hotel, and Defendant Mason IV's statement during the traffic stop that the keys he possessed were to a hotel room occupied by "B." Therefore, the fact that the affidavit did not indicate any specific instances of criminality then occurring in the hotel room was not fatal to a determination of probable cause. The information contained in the affidavit, once excised of any observations made by the detectives during their initial entry into the room, demonstrates that "the magistrate had a substantial basis for concluding that a search [of the hotel room] would uncover evidence of wrongdoing." *King*, 227 F.3d at 739.

## IV. CONCLUSION

For the reasons stated above, IT IS ORDERED that Defendant Johnson's motion to suppress evidence [Dkt. # 92] is DENIED.

                                                    s/Robert H. Cleland
                                                    ROBERT H. CLELAND
                                                    UNITED STATES DISTRICT JUDGE

Dated: April 12, 2012

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, April 12, 2012, by electronic and/or ordinary mail.

                                                    s/Lisa G. Wagner
                                                    Case Manager and Deputy Clerk
                                                    (313) 234-5522